643 So.2d 1153 (1994)
Russell C. ROBBAT, Appellant,
v.
Mary Glynn ROBBAT, Appellee.
No. 91-2651.
District Court of Appeal of Florida, Fourth District.
October 5, 1994.
Rehearing Denied November 8, 1994.
Edna L. Caruso of Caruso, Burlington, Bohn & Compiani, P.A., and Jack Scarola of Searcy, Denney, Scarola, Barnhart & Shipley, P.A., West Palm Beach, for appellant.
Neil B. Jagolinzer of Christiansen, Jacknin & Tuthill, West Palm Beach, for appellee.
FARMER, Judge.
This appeal has to do with the enforceability of a 1978 antenuptial agreement under Massachusetts law. In our opinion, the agreement is fully enforceable according to its terms under the relevant Massachusetts decisions.
Strictly speaking the issue is entirely answered by Osborne v. Osborne, 384 Mass. 591, 428 N.E.2d 810 (Mass. 1981), which decided for the first time in that state whether antenuptial agreements between a future husband and wife concerning property and alimony interests in the event of divorce were enforceable. Because, however, the Supreme Judicial Court of Massachusetts expressly stated that its Osborne decision was designed to mirror its earlier decision in Rosenberg v. Lipnick, 377 Mass. 666, 389 N.E.2d 385 (1979), involving antenuptial agreements between a future husband and wife concerning property interests upon death, one must also consult that case as well.
As Rosenberg was first in time, it may be more understandable to begin there. In that case a surviving wife sued her deceased husband's estate to invalidate a 1959 antenuptial agreement waiving any right to share in his estate. The trial court ruled against her, and she appealed. She argued to the Supreme Judicial Court of Massachusetts that the courts should refuse to enforce any such agreement that fails to make fair provisions for the wife if the husband failed to disclose his assets before contracting, and the husband's estate should have the burden of proving proper disclosure. In order to agree with her, the court would have been required *1154 to overrule Wellington v. Rugg, 243 Mass. 30, 136 N.E. 831 (1922), which held that fraud was the only basis to avoid an antenuptial contract and that the contract could not be invalidated on account of a husband's failure to disclose the value of his assets before entering into the agreement. In refusing to invalidate her agreement, and in thus affirming the decision of the trial court fully enforcing it, the court said:
"Although we agree that the Wellington principles should be abandoned, we do not think it wise to act retroactively. The Wellington decision has remained undisturbed law in this Commonwealth for over a half-century, and numerous agreements have undoubtedly been fashioned in reliance on its rule. Accordingly, we have reviewed this case for error under the law as it existed in 1959. We have discerned none and thus affirm the judgment for the defendants. However, we take this opportunity to delineate new rules that shall apply to antenuptial agreements executed after the publication date of this opinion." [e.s.]
389 N.E.2d at 386. In short, the court applied the law as it was in 1959 when the parties entered into their agreement and upheld it. It should be noted that Rosenberg deals only with agreements that affect an interest in property in the event of death to one of the marital partners.
Just over two years later, the same court took up Osborne, which involves a 1967 antenuptial agreement in which both parties' waived any right to alimony and to any interest in the other's property in the event of divorce. There the husband tried to avoid the agreement during divorce proceedings, seeking alimony and a division of 3 parcels of property titled only in the wife's name. On appeal, the court found the agreement controlling on all claims of the husband. In a section of its opinion labeled "Validity of the Antenuptial Agreement," the Osborne court began with the following:
"We must first determine the validity of the antenuptial agreement. This court has not previously passed on the validity of an antenuptial agreement that attempts to regulate the rights of parties in the event of their subsequent divorce." [e.s.]
428 N.E.2d at 814. That statement could not be clearer; none of the previous decisions of the court have determined the issue at hand. The court distinguished both Rosenberg and Wellington by saying that they dealt with agreements that pertained to rights only during marriage or upon death, but not upon divorce.
To dispel any uncertainty about whether prior precedent controlled and to demonstrate the evolution of legal thinking on the issue, the court briefly addressed a selection of its older cases. Statements in Fox v. Davis, 113 Mass. 255, 257-258 (1873),  to the effect that the "current of authority [wa]s against [the] validity of an agreement disposing of property and alimony rights unless the divorce was to take place immediately"  were deemed uncontrolling or as dicta. The court said (after first quoting from the Fox opinion): "[h]ad the issue come before this court several decades ago, the law as stated in Fox might well have been held to be controlling." [e.s.] 428 N.E.2d at 814. Similarly, French v. McAnarney, 290 Mass. 544, 195 N.E. 714 (1935), where the court had held that an antenuptial agreement waiving any claim for support was void as against public policy, was distinguished "in that there the parties were not divorced * * *." 428 N.E.2d at 814. French's holding was based on the reasoning that "certain rights and duties incident to the marital relation * * * could not be avoided by an antenuptial contract." Id. The court conceded, however, that if it had faced the issue in 1935 when French was decided, very likely the court would have followed French, saying:

"Under the case law of the time, this same reasoning would have applied to the rights of the parties upon divorce, since the obligation of the husband to pay alimony was also based on the husband's legal duty to support his wife." [e.s.]
Id.[1] The court did not adopt the French reasoning, however.
*1155 The Osborne court stated that the "closest this court has ever come" to addressing the issue is Kovler v. Vagenheim, 333 Mass. 252, 130 N.E.2d 557 (1955), which involved a premarital contract between the brothers of the bride and the husband, where the brothers agreed to indemnify the husband against any support he might have to pay for his wife and child. When the husband sought to enforce the contract after he had already obtained a divorce, the court concluded that the contract was enforceable but said: "a contract tending to divest a husband of any obligation incidental to his marriage is invalid," citing French. The Osborne court also suggested that if the husband had divested his support obligation by a contract with his wife "then a different result would have been reached [in Kovler]." [e.s.] 428 N.E.2d at 815.
At that point in the Osborne opinion, the court turned to a discussion of the development of the law outside of Massachusetts. Id. The court especially mentioned the Florida supreme court's decision in Posner v. Posner, 233 So.2d 381 (Fla. 1970), which it noted a number of jurisdictions have followed. Id. The court ended the issue by saying:
"We conclude that we shall follow the reasoning of the Posner case and its progeny and uphold the contract. While the matter is not free from dispute, it is apparent that the significant changes in public policy during the last decade in the area of domestic relations warrant a tolerant approach to the use of antenuptial contracts as vehicles for settling the property rights of the parties in the event of divorce. * * * We therefore hold that an antenuptial contract settling the alimony or property rights of the parties upon divorce is not per se against public policy and may be specifically enforced." [e.s.]
428 N.E.2d at 815-816.
Thus, properly read, the holding of the Massachusetts Supreme Judicial Court in Osborne is twofold: (1) no previous decision from it had addressed the issue of the enforceability of antenuptial agreements between the marital partners affecting rights upon divorce; and (2) antenuptial contracts settling property and support rights inter se in the event of divorce are not against public policy and will be enforced.
In a new section of its opinion labeled "Legal Limitations upon Antenuptial Agreements," the court prospectively imposed some of the same requirements on such agreements that it had previously imposed in Rosenberg. It stressed, however, that these court imposed limitations on the power to contract "should be applied prospectively from the date of our decision in that [Rosenberg] case" [e.s.] and then further that "none of these comments are relevant or applicable to the decision in the case before us." [e.s.] 428 N.E.2d at 816.
It is thus apparent that there are two sets of antenuptial agreements between marital partners pertaining to property and alimony rights upon divorce to be enforced under Massachusetts law. The first set consists of those agreements entered into before 30 March 1979, the date of the Rosenberg decision; and the second set consists of those entered into after 30 March 1979. The first set is enforced, unless fraudulently induced, without the court imposed limitations announced in Rosenberg, and the second set is enforced with them. As the agreement in this case was made on 21 September 1978 and was not induced by any fraud,[2] under *1156 Massachusetts law it is fully enforceable and without the Osborne-Rosenberg limitations.
The flaw in the reasoning of appellee is essentially compressed into the following sentence:
"It is clear from the tenor of the Osborne opinion that the Massachusetts Supreme Court [sic] believed that prior Massachusetts law would have invalidated a prenuptial agreement regulating property rights at the time of divorce."
What the Osborne court actually "believed" was that if the precise issue had been faced by the court during the period from Fox (1873) to Kovler (1955), the Supreme Judicial Court probably would have applied the reasoning used in those earlier cases and then decided the issue differently, but that it had not done so because it had not previously faced the precise issue.
For appellee's reasoning to be correct, the Massachusetts court would have had to refuse to enforce the agreement at issue in Osborne. The result in Osborne thus shows how the court intended its decision to be applied: it found the 1967 agreement valid  not invalid  and enforced it without the prospective limitations it imposed on agreements newly concluded after Rosenberg. What it actually did in 1981, when it finally confronted the divorce issue, was to reject the old reasoning, apply the new and enforce an agreement as written without any court imposed limitations. Indeed it had reached the identical result in Rosenberg.
By its own admission the Osborne court faced a case of first impression in 1981. In saying what the common law is in 1981, the highest court in the state was stating by necessary implication what the law had always been. The role of judges is only to find the law, not to make it or state what it will be or might have been.[3] If the law is to be changed that is the role of the legislature, not of courts. If a court decides that the common law has undergone an evolutionary change into something different than it had previously decided, it is still merely recognizing that society itself has changed while stating only what the law is. The practice of common law courts to state only prospective law is the subject of great dispute and has apparently been abandoned in the United States Supreme Court where it first was used in 1965.[4] In any case, when a state's highest court states what appears to be partially prospective law, its decision should not be interpreted to be any less retroactive than the court has itself expressly stated. There should be the strongest presumption against implied prospectivity.
As we see the antenuptial agreement controlling on all disputed issues, including the Florida property purchased by the husband in 1986, we therefore reverse the final judgment, leaving the dissolution intact, and remand for the entry of judgment on all property and alimony issues in accordance with the parties' 1978 agreement. The court shall also reconsider its ruling on attorney's fees in light of our decision.
*1157 REVERSED AND REMANDED WITH DIRECTIONS.
DELL, C.J., and STONE, J., concur.
NOTES
[1] Grammatically the word "would", when used as an auxiliary verb, makes the entire verb conditional. That is to say, the sense of the thought is true only to the extent that the implied or expressed condition of the sentence is also true. Here, the only defensible meaning of the quoted sentence is that if the court had actually confronted the current issue around the time of the French decision, it probably would have concluded then that antenuptial agreements affecting rights upon divorce were unenforceable owing to the then prevailing zeitgeist that such agreements were inimical to marriage because they facilitated divorce. Because, however, the court did not then confront the issue, the condition never occurred, and thus the thought is not true.
[2] In fact, it appears that the agreement was induced primarily by the wife's desire to keep her separate property from ever becoming marital property and to limit his right to any division from her separate assets. She is the life income beneficiary under two $500,000 trust funds, and her father had cautioned her about men taking financial advantage of her. The parties met in 1968 while both were in college; and except for one year they lived together from then until they married in 1978. From the time they began living together they have kept their finances separate. She has a degree in special education and has been so employed during their cohabitation and marriage.
[3] See e.g., Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (1910) (Holmes, J., dissenting) (complete retroactivity of decisions is the norm); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 534, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991) (Souter, J., opinion for plurality) (traditional function of courts is to decide cases before them on best current understanding of law); and American Trucking Ass'n v. Smith, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) (Scalia, J., concurring in judgment) (courts are understood only to find the law, not to make it).
[4] As to being the subject of great dispute, see Harper v. Virginia Dep't of Taxation, ___ U.S. ___, ___-___, 113 S.Ct. 2510, 2521-2524, 125 L.Ed.2d 74, (Scalia, J. concurring), cert. granted and judgment vacated sub nom. Lewy v. Virginia Dep't. of Taxation, ___ U.S. ___, 113 S.Ct. 3024, 125 L.Ed.2d 713 (1993). As to the abandonment of the practice by the United States Supreme Court, see Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (abandoning selective retroactivity in criminal cases in favor of complete retroactivity); and Harper, ___ U.S. at ___, 113 S.Ct. at 2510 (when Court applies rule of federal law to parties before it, rule is controlling interpretation of federal law and must be given full retroactive effect in all cases and as to all events whether such events predate or postdate announcement of rule). By general consensus, prospective application of a rule of law was first applied by the Supreme Court in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).