[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12990
_____

D.C. Docket Nos. 9:11-cv-80601-DMM,
9:11-cv-80638-DMM

9:11-cv-80601-DMM

WINN-DIXIE STORES, INC.,
WINN-DIXIE STORES LEASING, LLC,
WINN-DIXIE RALEIGH, INC.,
WINN-DIXIE RALEIGH LEASING, LLC,
WINN-DIXIE MONTGOMERY, LLC,
WINN-DIXIE MONTGOMERY LEASING, LLC,

Plaintiffs-Appellants,

versus

DOLGENCORP, LLC,

Defendant,

BIG LOTS STORES, INC.,

Defendant-Third Party Plaintiff
Counter Defendant-Appellee,

DOLLAR TREE STORES, INC.,

Defendant-Counter Claimant-

Appellee,

NORTHEAST PLAZA VENTURE I, LLC,

Counter Claimant,

AVON SQUARE, LTD, et al.,

Third Party Defendants.

_____

9:11-cv-80638-DMM

WINN-DIXIE STORES, INC.,
WINN-DIXIE STORES LEASING, LLC,
WINN-DIXIE RALEIGH, INC.,
WINN-DIXIE RALEIGH LEASING, LLC,
WINN-DIXIE MONTGOMERY, LLC,
WINN-DIXIE MONTGOMERY LEASING, LLC,

Plaintiffs-Counter Defendants-
Appellants,

versus

DOLLAR TREE STORES, INC.
a Virginia Corporation,

Defendant Counter-
Claimant-Appellee,

AVON SQUARE, LTD,

Third Party Defendant.

_____

9:11-cv-80641-DMM

WINN-DIXIE STORES, INC.,

WINN-DIXIE STORES LEASING, LLC,
WINN-DIXIE RALEIGH, INC.,
WINN-DIXIE RALEIGH LEASING, LLC,
WINN-DIXIE MONTGOMERY, LLC,
WINN-DIXIE MONTGOMERY LEASING, LLC,

Plaintiffs-Appellants,

versus

BIG LOTS STORES, INC.,

Defendant-Third Party Plaintiff-
Counter Defendant-Appellee,

NORTHEAST PLAZA VENTURE I, LLC,

Third Party Defendants-
Counter Claimant,

AVON SQUARE, LTD et al.,

Third Party Defendants.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(January 31, 2018)

Before ED CARNES, Chief Judge, ANDERSON, and PARKER,[*] Circuit Judges.

ED CARNES, Chief Judge:

---

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

After we have remanded a case with specific instructions, attorneys rarely attempt to have the district court defy our mandate. And even if they try it, a district court is seldom misled into that kind of error by them. This is one of those rare cases where the attorneys representing one side successfully urged the district court to act contrary to our mandate. Of course, we reverse that part of its judgment.

## I.  FACTS AND PROCEDURAL HISTORY

Winn-Dixie filed a lawsuit against Big Lots, Dollar General, and Dollar Tree. The facts underlying that lawsuit, which eventually led to this appeal, follow.

### A.  Winn-Dixie Discovers Alleged Violations Of Its Grocery Exclusives

Winn-Dixie owns or operates Winn-Dixie grocery stores on leased property in several states. Its stores are often the anchor tenant in a shopping center, which gives it the power to negotiate leases that limit what its neighboring competitors can sell in their stores. The leases that Winn-Dixie negotiates often include a "supermarket and pharmacy exclusive" provision, which we will refer to as a "grocery exclusive" provision. The key language in these provisions limits the amount of space those neighboring stores can devote to selling grocery products that compete with what Winn-Dixie is selling. Here from a typical lease is the grocery exclusive language that Winn-Dixie insists on:

4

Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the Shopping Center and any enlargement thereof.  Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the Shopping Center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off premises consumption any staple or fancy <u>groceries</u>, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of <u>sales area</u> or 10% of the square foot area of any storeroom within the Shopping Center, as an incidental only to the conduct of another business . . . shall not be deemed a violation hereof.

(Emphasis added.)

### B.  Winn-Dixie Sues Big Lots, Dollar General, And Dollar Tree

Winn-Dixie discovered that many co-located stores (that is, stores located in the same shopping center as its own stores) were selling "groceries" in a "sales area" greater than the grocery exclusive provisions permitted.  As a result, in 2011 it filed three separate lawsuits against Big Lots, Dolgencorp (Dollar General's parent company, which we are referring to as "Dollar General"), and Dollar Tree, claiming that they were operating stores in Alabama, Florida, Georgia, Louisiana, and Mississippi in violation of Winn-Dixie's rights under the leases.  Winn-Dixie contended that it had negotiated grocery exclusive provisions with the landlords of

5

each of the shopping centers at issue, and that those provisions were restrictive covenants running with the land that bound tenants that moved into the shopping center thereafter.

Winn-Dixie wanted to enforce the grocery exclusive provisions against a total of 97 stores:  51 Dollar General stores, 32 Dollar Tree stores, and 14 Big Lots stores.  Of those 97 stores, 75 were located in Florida, 13 were in Alabama, 6 were in Louisiana, 2 were in Georgia, and 1 was in Mississippi.  Winn-Dixie sought compensatory damages and punitive damages, as well as an injunction ordering the stores in violation of the provisions to remove groceries from their stores to the extent necessary to end the violation and ordering them not to violate the provisions in the future.

1.  The District Court's Ruling

The district court consolidated the three cases into one.  After a bench trial, the court determined that Winn-Dixie could pursue claims against a total of 54 Big Lots, Dollar General, and Dollar Tree stores that were located in Alabama, Florida, and Georgia.  It reasoned that under the law of those three states, the grocery exclusive provisions were real property covenants that ran with the land, and as a result could be enforced even though the stores were not themselves parties to

6

Winn-Dixie's leases. The district court denied Winn-Dixie any relief for the 43 other stores for a number of reasons.[1]

The district court then turned to answering the question of whether the 54 Big Lots, Dollar General, and Dollar Tree stores in Alabama, Florida, and Georgia that were still in the lawsuit violated the grocery exclusive provisions, a task that required interpreting the terms "groceries" and "sales area" in the provisions. Without explanation, the court applied Florida law to interpret those two key terms not only for the stores in that state but also for the stores in Alabama and Georgia. It found that the terms "groceries" and "sales area" were ambiguous and that Winn-Dixie did not present any extrinsic evidence that revealed the contracting parties' original intent as to the terms. The court acknowledged the existence of 99 Cent, a Florida appellate court decision that had addressed what the terms "groceries" and "sales area" meant in a materially identical grocery exclusive provision. See Winn-Dixie Stores, Inc. v. 99 Cent Stuff-Trail Plaza, LLC, 811 So. 2d 719 (Fla. 3d DCA 2002) ("99 Cent"). But the district court thought that decision was distinguishable. Instead of following 99 Cent, the district court itself decided the meaning to be given the terms, defining "groceries" to be "food items"

---

[1] Of those 43 stores: 31 of them had closed; 7 of them were in Louisiana and Mississippi where the covenants were not enforceable; 1 store's lease predated the grocery exclusive provision, making that provision unenforceable against that store; and 4 of them had "nonstandard covenants" that led the district court to conclude that it could not craft for those stores an injunction satisfying the requirements of Federal Rule of Civil Procedure 65(d).

7

and "beverages, including, but not limited to, bottled water, soda, and energy and coffee drinks, but excluding alcoholic beverages." It defined "sales area" "to include only the footprint of the display unit, excluding aisle space."

Based on those definitions, the district court refused to grant Winn-Dixie injunctive relief for 37 of the 54 stores in the three states, but did grant it that relief for 17 Florida stores.[2] The court denied Winn-Dixie's claims for compensatory damages and punitive damages. Winn-Dixie appealed.

## 2. This Court's Previous Decision

We affirmed in part and reversed in part the district court's judgment. See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1045 (11th Cir. 2014). Finding no error in the district court's rulings as to 43 of the 97 stores, see supra note 1, we affirmed the part of the judgment that denied Winn-Dixie all relief regarding those 43 stores. Id.

As to the remaining 54 stores, we reversed the district court's judgment in two critical respects. First, we held that the district court erred in applying Florida law to interpret the grocery exclusive provisions for the 11 stores located in Alabama and the 2 stores in Georgia. Id. at 1026–27. We explained that Florida's

---

[2] For 10 of the 17 Florida store locations, the district court ordered the defendants to comply with the terms of the grocery exclusive provisions within thirty days of its order. As to the other 7 Florida stores, it ordered them to measure the "sales area" dedicated to "groceries" "to ensure that they are in fact not violating Winn-Dixie's grocery exclusives and to come into compliance if necessary."

choice of law rules required the district court to apply the substantive law of the state where the property is located.  Id.  We remanded that part of the case to the district court so that it could apply Alabama law to the Alabama stores and Georgia law to the Georgia stores.  Id.

Second, we held that as to the 41 Florida stores the district court "erred in finding the terms ['groceries' and 'sales area'] ambiguous and proceeding . . . to construe the terms narrowly."  Id. at 1026.  We explained that it instead "should have followed the holding in 99 Cent by looking to the dictionary definitions, which instruct that 'groceries' includes food and 'many household supplies . . . and that sales area 'includes fixtures and their proportionate aisle space.'"  Id. (quoting 99 Cent, 811 So.2d at 722).  We told the district court to look to the 99 Cent decision's "specific holding and . . . general analytical framework" in determining which items are "groceries."  Id. at 1026 n.18.  Because the district court had erred by not following 99 Cent, we reversed its judgment as to the 41 Florida stores and remanded the case for a new trial based on the definitions set out in the 99 Cent decision.[3]  Id. at 1026.

---

[3] We identified the stores at issue by the corporate numbers of the co-located stores.  So, for example, "Dollar General # 246, co[-]located with Winn–Dixie #478, [was] signified as 'DG246/WD478.'"  Winn-Dixie, 746 F.3d at 1017 n.1.  The 41 Florida stores were: BL505/WD506; BL512/WD2210; BL525/WD698; BL530/WD654; BL550/WD609; BL553/WD236; BL555/WD307; BL558/WD160; BL1519/WD306; BL1628/WD348; BL1711/WD302; BL4258/WD254; DG1056/WD489; DG1416/WD622; DG1453/WD662; DG1541/WD629; DG2634/WD777; DG2969/WD681; DG7376/WD737; DG8551/WD561; DT332/WD2311; DT723/WD254; DT807/WD657; DT892/WD2230; DT986/WD737;

9

### 3. The District Court's Ruling on Remand

Back in the district court on remand, Dollar General, Dollar Tree, and Winn-Dixie each moved for summary judgment. After a hearing on those motions, the district court issued its order, which is the judgment now before us.

The district court first addressed the Alabama stores. It explained that, because there were no Alabama cases defining "groceries" or "sales area," the two terms were ambiguous. As a result, it construed the two terms narrowly pursuant to Alabama law, concluding that the term "groceries" means "food only, which excludes prepared foods and includes beverages, including but not limited to, bottled water, soda, and energy and coffee drinks, but excluding alcoholic beverages." It concluded that "sales area" means "only the footprint of the display unit, excluding aisle space." Applying those definitions, the district court found that none of the Alabama stores was violating the grocery exclusive provisions.

The district court also found that, under Georgia law, the same terms were ambiguous, and the court defined them the same way it had under Alabama law. The 2 Georgia stores were both Dollar Tree stores. Dollar Tree later settled with

DT1566/WD228; DT2117/WD353; DT2159/WD309; DT2714/WD2205; DT2804/WD84; DT2838/WD412; DT4181/WD678; DT4199/WD255; DT4230/WD656; DT4266/WD501; DT4339/WD632; DT4365/WD236; DT4497/WD378; DT4511/WD647; DT4550/WD658; DT4625/WD577. Id. at 1045 n.29. We realize that some of the 41 Florida stores are no longer in operation, but for ease of reference we will still refer to the remaining Florida stores as "the 41 Florida stores."

10

Winn-Dixie and is no longer a party in this case. As a result, no Georgia stores are involved in this appeal.

The district court then considered the Florida stores, and this is where it erred. It noted that for a covenant running with the land to be valid, Florida law requires, among other things, that the party against whom enforcement is sought have notice of the restriction. The court believed that, although Big Lots, Dollar General, and Dollar Tree had notice of the existence of the grocery exclusive provisions when they entered into their leases, they did not have notice of the actual scope of those provisions until the February 20, 2002 decision in 99 Cent, because "groceries" and "sales area" were ambiguous before that decision. As a result, for the Big Lots, Dollar General, and Dollar Tree stores with leases executed before February 20, 2002, the court did not apply the definitions of the two key terms that are found in the 99 Cent decision, which we had instructed it to apply. Instead, the district court decided that:

> For [d]efendants' Florida stores that entered lease agreements prior to February 2002, "groceries" means food only, which excludes prepared foods and includes beverages, including but not limited to, bottled water, soda, and energy and coffee drinks, but excluding alcoholic beverages, and "sales area" includes only the footprint of the display unit, excluding aisle space.

The district court did rule that the 99 Cent definitions of "groceries" and "sales area" applied to the Florida stores, if any, whose leases were executed after February 20, 2002, the date of the 99 Cent decision. It interpreted 99 Cent's

11

definition of "groceries" to "include food (excluding prepared foods) and beverages (excluding alcoholic beverages) as well as many household supplies." And it stated that, based on the 99 Cent decision's examples of household products — "soap, matches, [and] paper napkins" — the household items "that are to be considered groceries are the types associated with the preparation and service of food, as well as the maintenance of a clean kitchen (as the primary place where food is prepared)." It defined "sales area" to include "fixtures and their proportionate aisle space." When the dust cleared, the district court had applied the 99 Cent definitions to 14 Dollar Tree stores, which are the only Florida stores with leases executed after February 20, 2002.

The district court granted Dollar General's motion for summary judgment as to its stores. The court also granted in part Dollar Tree's motion for summary judgment as to 13 of its stores and granted Winn-Dixie's motion for summary judgment as to the remaining 14 Dollar Tree stores. This is Winn-Dixie's appeal.

## II. STANDARD OF REVIEW

"We review de novo the district court's interpretation and application of this [C]ourt's mandate" in a previous appeal, Cox Enters., Inc. v. News-Journal Corp., 794 F.3d 1259, 1272 (11th Cir. 2015), as well as its interpretation of state law, Jones v. United Space All., L.L.C., 494 F.3d 1306, 1309 (11th Cir. 2007). We also "review de novo the district court's interpretation of the language of [a] restrictive

12

covenant." Winn-Dixie, 746 F.3d at 1021. "However, if the language is ambiguous and the district court must look to extrinsic evidence to determine the intent of the parties, the district court's determination of such intent is a finding of fact and is reviewed using the clearly erroneous standard." Id. (quotation marks omitted).

### III.  THE FLORIDA STORES

Winn-Dixie contends that, as to the Florida stores, the district court violated this Court's mandate and also erred in interpreting the 99 Cent decision's definition of "groceries."

### A.  The Violation Of Our Mandate As To 41 Florida Stores

Winn-Dixie first contends that the district court violated our mandate by declining to apply 99 Cent's definitions of "groceries" and "sales area" to all 41 Florida stores.  And it did.

"The mandate rule is a specific application of the 'law of the case' doctrine which provides that subsequent courts are bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." Friedman v. Mkt. St. Mortg. Corp., 520 F.3d 1289, 1294 (11th Cir. 2008) (quotation marks omitted).  "The law of the case doctrine and the mandate rule ban courts from revisiting matters decided expressly or by necessary implication in an earlier appeal of the same case." AIG Baker Sterling Heights, LLC v. Am. Multi-

13

Cinema, Inc., 579 F.3d 1268, 1270–71 (11th Cir. 2009).  It has its greatest force when a case is on remand to the district court.  "When an appellate court issues a clear and precise mandate, . . . the district court is obligated to follow the instruction.  Neither the district court nor any party is free to ignore the law of the case."  Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1516 (11th Cir. 1987).  "A district court when acting under an appellate court's mandate, cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded."  Id. at 1510–11 (quotation marks omitted).

Needless to say (or maybe not), a district court cannot amend, alter, or refuse to apply an appellate court's mandate simply because an attorney persuades the court that the decision giving rise to the mandate is wrong, misguided, or unjust.  A district court can, of course, wax eloquent about how wrong the appellate court is, but after the waxing wanes the mandate must be followed.

The mandate in our earlier decision in this case involving the Florida stores did not leave room for confusion or genuine doubt.  It was not vague or ambiguous.  Our instructions regarding those stores were clear:

> [W]e conclude that the district court erred in finding the terms ambiguous and proceeding . . . to construe the terms narrowly. Instead, the court should have followed the holding in 99 Cent by looking to the dictionary definitions, which instruct that "groceries"

14

includes food <u>and</u> "many household supplies (as soap, matches, paper napkins)" <u>and</u> that sales area "includes fixtures and their proportionate aisle space."    Because the district court erred in discerning and applying Florida's law, for these forty-one Florida stores, we reverse the judgment of the district court and remand the case for a new trial based on the definition of the terms "staple or fancy groceries" and "sales area" under Florida law as pronounced by Florida's Third District Court of Appeals in <u>99 Cent</u>.

<u>Winn-Dixie</u>, 746 F.3d at 1026 (citation and footnote omitted).  And if that were not enough, we restated in the last paragraph of the opinion:

In sum, we hold that, for forty-one Florida stores, the district court misapplied Florida law in determining whether [d]efendants had violated Winn–Dixie's restrictive covenants.  For these stores, we reverse and remand for a new trial based on a definition of "staple or fancy groceries" and "sales area" consistent with the holding of the Florida Third District Court of Appeals in <u>99 Cent</u>.

<u>Id.</u> at 1044–45 (footnote omitted).

There is no imprecision in those instructions, no room for evasive interpretation, in short, there is no legitimate basis for applying what we said only to a subset of the 41 Florida stores.  We don't know what else we could have said other than, perhaps, "and we really mean it."  Well, we really did mean it.  And we still do.

The district court did not do what we instructed it to do because it was led astray by the defendants' attorneys.  In their written opposition to Winn-Dixie's motion for summary judgment on remand, those attorneys acknowledged that, as to the Florida stores, "[t]he Eleventh Circuit reversed [the district court's] Judgment

15

and remanded the case for a new trial 'based on the definition of the terms "staple or fancy groceries" and "sales area" under Florida law as pronounced by Florida's Third District Court of Appeals in [99 Cent].'"[4]  That ought to have been the end of that.

But it wasn't.[5]  The defendants' attorneys contended that, as for the "stores that opened prior to the issuance" of the 99 Cent decision in February 2002, "Winn-Dixie's grocery exclusives were undeniably ambiguous because there was no established definition for either 'sales area' or 'groceries'" before the 99 Cent court issued that decision.  So they argued:  "Application of the subsequently broadened definitions in 99 Cent would attach new legal consequences to [d]efendants' previously vested rights to operate their stores.  Fundamental notions of fairness and due process prohibit the retroactive application of the definition of 'groceries' and 'sales area' pronounced for the first time in 99 Cent."  As a result, those attorneys insisted, "[t]he 99 Cent decision should not be retroactively applied to leases entered into prior to February 2002 when [that] opinion was issued" — despite this Court's mandate that the district court must apply 99 Cent's definitions to all of the 41 Florida stores.

_____

[4] For the rest of the opinion, we refer to Big Lots and Dollar General as the "defendants" because Dollar Tree is no longer a party.

[5] No judge on this panel was on the panel that issued the initial decision.  That fact, of course, does not affect the law of the case doctrine or the mandate rule.

16

At the hearing on Winn-Dixie's and Dollar General's cross motions for summary judgment, counsel for Big Lots and Dollar General were similarly blunt in urging the district court to disregard our directive to apply 99 Cent's definitions to the Florida stores' leases.  After the district court stated that "it's apparent what the Eleventh Circuit thinks" about applying 99 Cent's definitions of "groceries" and "sales area" to the Florida stores, the defendants' counsel argued that:  "Your Honor doesn't need to get there" because all of Big Lots' and Dollar General's Florida stores' leases were executed before 2002.  Counsel elaborated:

> Your Honor can avoid that issue entirely by finding that 99 Cent, while it may apply to [d]efendants' stores that executed leases after 2002, does not apply to Big Lots and Dollar General stores that executed leases prior to 2002, when there was no fair warning that sales area would be construed broadly to include proportionate aisle space and that groceries would include all manner of household supplies.

The district court sought to make sure it was correctly understanding the defendants' argument, asking:  "And so your argument is I should just say [99 Cent] doesn't apply to you all[?]"  Counsel answered:  "Yes, Your Honor."

That's not all.  Defendants' counsel added mischaracterization to defiance by stating that this Court, in our previous decision:

> did not reverse with instructions that a specific definition be entered in an order by this [c]ourt.  It did not reverse and say this is the definition that we are ordering this [c]ourt to adopt.  It said, [w]e reverse and

17

remand, with instructions that [the district court] apply the general analytical framework of 99 Cent.[6]

But, contrary to what counsel represented to the district court, this Court did reverse with instructions for that court to adopt and follow the definitions from the 99 Cent decision. To repeat, in explaining why we were reversing the district court's judgment and ordering a new trial, we stated:

> Because the district court erred in discerning and applying Florida's law, for these forty-one Florida stores, we reverse the judgment of the district court and remand the case for a new trial based on the definition of the terms "staple or fancy groceries" and "sales area" under Florida law as pronounced by Florida's Third District Court of Appeals in 99 Cent.

Winn-Dixie, 746 F.3d at 1026 (footnote omitted). Counsel urged the district court to disregard that clear directive: "I would . . . submit, first and foremost, that 99 Cent should not be applied, whether it's the general analytical framework or the specific holding because the stores at issue here are not bound by 99 Cent . . . ."[7]

---

[6] All of the quoted statements from the hearing urging the district court not to follow our mandate were made by attorney Brian P. Watt of Troutman Sanders LLP. We mention that because we do not want an unfair inference to be drawn that any of those statements and misstatements were made by other attorneys who represented Big Lots and Dollar General in the district court.

[7] That was not the only mischaracterization by the defendants' counsel. He also told the district court that "99 Cent, to be perfectly clear, does not define groceries, it does not define sales area, it does not p[re]scribe what proportionate aisle space means." But "to be perfectly clear," the 99 Cent decision does indeed define groceries:

> Groceries are generally defined as 'articles of food and other goods sold by a grocer,' and a grocer is defined as 'a dealer in staple food stuffs . . . and many household supplies (as soap, matches, paper napkins).' Employing this definition, we conclude that the trial court tailored the relief granted too narrowly. The

18

But "first and foremost," this Court had decided exactly the opposite and mandated that the district court apply 99 Cent's definitions to the 41 Florida stores.  See id.

The district court asked counsel:  "Are you arguing, then, that an injunction shouldn't issue, that the definition [of sales area] shouldn't be applied to any of these stores, what exactly is your argument?"  And it asked:  "Where does that argument take us now, though?  I mean, I understand it and I guess you probably argued that to the Eleventh Circuit, but at this point, don't we have to conclude that groceries means more than food?"  The district court questioned how it could come up with definitions of the terms "groceries" and "sales area" different from the ones that this Court had instructed it to apply:  "But I mean, again, I don't see how I can get there.  The Eleventh Circuit has told me I was wrong about [what the terms mean].  . . . [I]t seems to me it's apparent what the Eleventh Circuit thinks."

Apparent though it was what this Court had thought, had said, and had told the district court to do, counsel eventually persuaded the court not to do it.  In its order on the cross motions for summary judgment, the district court accepted the

---

commonly recognized definition of the term groceries includes more than just food.

811 So. 2d at 722 (citation omitted).  And as to "sales area," the 99 Cent decision states that:

Limiting the amount of sales area to just the 'footprint' of the actual fixtures is not a reasonable construction of the clause at issue. . . .  Thus, on remand, the temporary injunctive relief granted should be revised to make clear that the 500 square foot figure includes fixtures and their proportionate aisle space.

Id.

defendants' position "that the 99 Cent case should not be applied retroactively to [d]efendants' leases executed before the date of that decision, which was February 20, 2002." (Emphasis added.) And that is how the district court ruled: "I will not apply 99 Cent's definition of groceries or sales area to [d]efendants' leases that were executed prior to [the] date of the 99 Cent decision."

In an effort to defend their position and the district court's post-remand ruling that the 99 Cent decision would not be applied to stores with leases executed before February 20, 2002, the defendants argue that applying the 99 Cent definitions to those leases would violate "fundamental notions of fairness and due process." And besides, they argue, the 99 Cent decision is wrong.

First, the defendants did not make either of those arguments in their briefs when the case was before this Court the first time, before our first decision. They could have. Instead, they contended that the 99 Cent decision was distinguishable because of "numerous factual and legal differences," none of which involved these arguments. They argued that the "[d]istrict [c]ourt properly distinguished 99 Cent from the case at bar, and found that it was not controlling," but the court did not do so based on any of the reasons they now assert. The defendants also could have made their new, belated arguments in a petition for rehearing after our decision was issued. But they didn't bother to file one. Apparently, their idea of a good strategy is not to fire all of one's shots in the court of appeals but to save a couple

20

of rounds to shoot down the appellate decision after we send the case back to the district court for our decision to be carried out. That is not a strategy that will or should work. See Litman, 825 F.2d at 1511 ("Failure to honor [the law of the case doctrine's] commands can only result in chaos.").

That the defendants did not raise those issues in their briefs in the first appeal or in a petition for panel rehearing does not in any way undermine the strength of the law of the case doctrine or the force of the mandate rule. See Transamerica Leasing, Inc. v. Inst. of London Underwriters, 430 F.3d 1326, 1331 (11th Cir. 2005) ("The [law of the case] doctrine's central purposes include bringing an end to litigation, protecting against the agitation of settled issues, and assuring that lower courts obey appellate orders."). Put somewhat differently, an argument or issue that was not expressly addressed but was decided by necessary implication in the earlier decision is covered by the law of the case doctrine and the mandate rule. See Am. Multi-Cinema, 579 F.3d at 1270–71; see also Friedman, 520 F.3d at 1294 ("The law of the case doctrine and the mandate rule apply to all issues decided expressly or by necessary implication.") (alterations and quotation marks omitted). The new reasons the defendants now assert for not applying the 99 Cent decision were all decided, and rejected, by necessary implication in our previous decision.

Even if we turned the system upside down and allowed our decisions to be second-guessed in the district courts, the defendants' belated arguments against applying the 99 Cent decision are meritless anyway. The argument they stress is that our application of the 99 Cent decision to leases executed before that decision was issued violates "fundamental notions of fairness and due process." They rely on several decisions, including a criminal one, for the proposition that there is a "strong presumption against retroactive application" of state and federal statutes affecting contractual rights, property rights, or liberty interests. Of course, we are talking about a judicial decision, not a statute. That major difference makes no difference, they say, because "the 99 Cent decision had the same effect as a statutory codification of definitions for 'groceries' and 'sales area' in this case." But so do a lot of judicial decisions, including most or all of the decisions defining statutory terms.

A judicial decision is not, however, a statute. And as Justice Holmes once put it, "[j]udicial decisions have had retrospective operation for near a thousand years." Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372, 30 S. Ct. 140, 148 (1910) (Holmes, J., dissenting); cf. Harper v. Va. Dep't of Taxation, 509 U.S. 86, 97, 113 S. Ct. 2510, 2517 (1993) ("[In civil cases, when the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect . . . as to all events, regardless

22

of whether such events predate or postdate our announcement of the rule."); Smith v. Jones, 256 F.3d 1135, 1140 (11th Cir. 2001) (same).  Judicial decisions operate the same way in Florida, as well, having retroactive effect.  See Robbat v. Robbat, 643 So. 2d 1153, 1156 (Fla. 4th DCA 1994) ("In saying what the common law is in 1981, the highest court in the state was stating by necessary implication what the law had always been.  The role of judges is only to find the law, not to make it or state what it will be or might have been. . . .  [W]hen a state's highest court states what appears to be partially prospective law, its decision should not be interpreted to be any less retroactive than the court has itself expressly stated.  There should be the strongest presumption against implied prospectivity.") (footnote omitted); see also Phillips v. State, 623 So. 2d 621, 621 n.1 (Fla. 4th DCA 1993) ("As Justice Scalia explained in his concurring opinion in Harper, '[T]he true traditional view is that prospective decision-making is quite incompatible with the judicial power, and that the courts have no authority to engage in the practice.'") (quoting Harper, 509 U.S. at 106, 113 S. Ct. at 2522 (Scalia, J., concurring)); cf. Smith v. State, 598 So. 2d 1063, 1066 (Fla. 1992) ("[A]ny decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final.").  Unlike the enactment of a

23

statute, the 99 Cent decision did not create law; it stated what the terms "groceries" and "sales area" had always meant. See Robbat, 643 So. 2d at 1156.

Not only that, but the defendants' contention that the 99 Cent definitions cannot be applied to leases executed before that decision was issued cannot be reconciled with that decision itself. Under the defendants' logic, the 99 Cent court could not have applied the definitions of "groceries" and "sales area" to the leases at issue in that case because the defendant would not have known what those terms meant until the appellate decision in his own case was issued in 2002. But the 99 Cent court did apply the definitions of "groceries" and "sales area" it announced to leases in that case which, of course, predated the issuance of the decision.

The defendants also argue that the 99 Cent decision is wrong as a matter of Florida law about the definitions of "groceries" and "sales area," suggesting that was a good ground for the district court not to apply 99 Cent on remand. It is the defendants' argument that is wrong. State law is what the state appellate courts say it is, and we are bound to apply a decision of a state appellate court about state law even if we think that decision is wrong. See Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir. 1983) ("A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise. A federal court is bound by this rule whether or not the court

24

agrees with the reasoning on which the state court's decision is based or the outcome which the decision dictates.") (citation omitted).

Finally, the defendants argue that the district court did not have to follow our mandate because on remand they presented it with new evidence. See Ash v. Tyson Foods, Inc., 664 F.3d 883, 891 (11th Cir. 2011). The new "evidence" they point to is what they characterize as "multiple, inconsistent dictionary definitions of 'groceries' and no recognized dictionary definition of 'sales area,'" which would contradict the 99 Cent court's holding, which our previous decision recited, that the dictionary definitions of the terms "groceries" and "sales area" are clear and unambiguous. See Winn-Dixie, 746 F.3d at 1024. But definitions in dictionaries are not evidence within the meaning of that exception to the law of the case doctrine and, in any event, the exception does not apply when the new evidence is "inconsistent with what the appellate court had adjudged." Ash, 664 F.3d at 891 (quoting Doran v. Petroleum Mgmt. Corp., 576 F.2d 91, 93 (5th Cir.1978)).

Because the district court did not apply the 99 Cent decision and its definitions to all 41 of the Florida stores but only to the 14 with leases executed after February 20, 2002 (the 14 Dollar Tree stores), we will remand with instructions that the district court apply that decision and its definitions to the other Florida stores as well.

25

That, however, is not the end of the issues involving the 99 Cent decision and the Florida stores. Winn-Dixie also contends that the district court erred in its application of 99 Cent to the 14 stores that it recognized were covered by that decision.

### B.  The District Court's Interpretation Of "Groceries" In The Florida Grocery Exclusive Provisions

According to Winn-Dixie, the district court misinterpreted the definition of "groceries" from the 99 Cent decision, defining the term too narrowly. The defendants counter that this issue is moot because the 99 Cent definition of "groceries" was applied only to 14 Dollar Tree stores, which were the only stores that had leases dated after February 20, 2002, and Dollar Tree is no longer a party to this appeal.

The issue is not moot. When this case is remanded yet again the 99 Cent definition of "groceries" will be applied to the remaining Dollar General and Big Lots stores in Florida. What that term means is a question of law that we review de novo, and how we interpret the term will make a difference to the parties and the outcome of the case. See Zinni v. ER Sols., Inc., 692 F.3d 1162, 1166 (11th Cir. 2012) ("An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.") (quotation marks omitted). And the issue is ripe. See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1224 (11th Cir. 2004) ("In deciding whether a claim is ripe for adjudication

26

or review, we look primarily at two considerations:  1) the fitness of the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration.").  The district court has already considered this issue and applied its interpretation of "groceries."  Although it did not apply that interpretation to the stores at issue in this appeal, the question of law will be the same on remand, and we will answer it now.

Even though the district court disregarded our directive to apply the 99 Cent definitions of "groceries" and "sales area" to all of the Florida stores, it did apply that decision to 14 of them.  The "who" was wrong — underinclusive — but the "how" was right.  In our previous decision we explained that the district court should "follow[ ] the holding in 99 Cent by looking to the dictionary definitions, which instruct that 'groceries' includes food and 'many household supplies (as soap, matches, paper napkins).'"  Winn-Dixie, 746 F.3d at 1026.  And as we have already explained, the case was remanded for a new trial based on that definition of "groceries."  See id.  And in our decision we acknowledged that "it may not be easy to pinpoint each item to be considered groceries," id. at 1026 n.18 (quoting 99 Cent, 811 So. 2d at 722), but we "ha[d] faith in the district court's ability to apply both the specific holding and the general analytical framework" from the 99 Cent decision in determining which items are "groceries," id.

27

The <u>99 Cent</u> decision explained that "[p]arties are bound by the clear words of their agreements" and that, unless a document "contains a glossary of terms requiring a different meaning, which is not the case here," one "looks to the dictionary" to find "the plain and ordinary meaning of words."  811 So. 2d at 722 (citation omitted).  It also stated that "groceries" are generally defined as "articles of food and other goods sold by a grocer," and a "grocer" is defined as "a dealer in staple food stuffs . . . and many household supplies ([such] as soap, matches, paper napkins)."  <u>Id.</u> (quoting <u>Webster's New Int'l Dictionary</u> (3d ed. 1986)).[8]  The <u>99 Cent</u> court held that in that case "[t]he trial court's failure to give the terms at issue their plain and ordinary meaning mandates reversal."  <u>Id.</u>

Because <u>99 Cent</u>'s definition of "groceries" includes "<u>many</u> household supplies," <u>id.</u> (emphasis added), it is clear that "groceries" includes some "household supplies" but not all of them.  It is not clear which "household supplies" should be considered "groceries."  The grocery exclusive provisions in Winn-Dixie's leases do not define the term "household supplies."  That's not surprising, given that the term is not in those provisions but instead comes from the <u>99 Cent</u> court's definition of "groceries," which is the term used in the leases.  And

---

[8] The <u>99 Cent</u> decision also gave "sales area" its plain meaning, stating that the area "includes fixtures and their proportionate aisle space" because "[s]hoppers do not arrive by chopper, sending ropes down to hoist up their purchases" but instead "make their choices while standing in aisles."  <u>99 Cent</u>, 811 So. 2d at 722.  Winn-Dixie does not challenge the district court's interpretation of the term "sales area," presumably because the court simply applied the same definition that the <u>99 Cent</u> court provided:  that "sales area" "includes fixtures and their proportionate aisle space."

although we can resort to the dictionary for the "plain and ordinary meaning" of the terms "household" and "supplies," a dictionary cannot tell us which "household supplies" are "groceries."

Even so, the 99 Cent decision did provide some guidance by listing three examples of "household supplies" that are "groceries":  soap, matches, and paper napkins.  Id.  Although each of those three items can be used outside of the kitchen and in ways that are completely unrelated to food, we agree with the district court that the common thread among them is "the preparation and service of food" and "the maintenance of a clean kitchen (as the primary place where food is prepared)." Based on those three examples, as well as the word "many" to indicate that not all "household supplies" are groceries, it appears that only certain nonfood items fit into the category of "groceries" as 99 Cent defined that term, and those nonfood items must relate to food.[9]

Supporting that interpretation, which is more narrow than Winn-Dixie would like, is the guiding principle that "covenants are strictly construed in favor of the free and unrestricted use of property."  Esbin v. Erickson, 987 So. 2d 198, 201

_____

[9] Winn-Dixie argues that the district court should have considered its proposed products list, which it says was "culled from authoritative industry publications," in determining which products were "groceries."  Even if the district court were entitled to use that products list if it wished, the court was not required to use it based on our previous decision, the 99 Cent decision, or other Florida law.  We ordered the district court to apply the "specific holding and the general analytical framework" of the 99 Cent decision in "pinpoint[ing] each item to be considered groceries."  Winn-Dixie, 746 F.3d at 1026 n.18.  We did not require it to consult any outside sources to craft its list, see id., nor did the 99 Cent court suggest looking to any outside sources except for dictionaries, see 811 So. 2d at 722.

29

(Fla. 3d DCA 2008) (quoting Norwood-Norland Homeowners' Ass'n v. Dade County, 511 So. 2d 1009, 1014 (Fla. 3d DCA 1987)).  A narrow interpretation of "household supplies" supports the free and unrestricted use of property by permitting the defendants to sell more nonfood groceries than they could under a broader, more restrictive interpretation of that term.  By interpreting "household supplies" as referring only to items "associated with the preparation and service of food, as well as the maintenance of a clean kitchen (as the primary place where food is prepared)," the district court's interpretation comports with the 99 Cent decision and with Florida law on interpreting restrictive covenants.

## IV.  THE ALABAMA STORES

In our previous opinion we instructed the district court to apply Alabama law to interpret the terms of the grocery exclusive provisions for the Alabama stores.  See Winn-Dixie, 746 F.3d at 1027.  Winn-Dixie contends that the district court erred in ruling that, under Alabama law, the terms "groceries" and "sales area" are ambiguous and must be construed narrowly against Winn-Dixie.

Alabama's approach to interpreting restrictive covenants is similar to Florida's in that clear and unambiguous language in a restrictive covenant is given its "plain and manifest meaning."  Vestlake Cmtys. Prop. Owners' Ass'n v. Moon, 86 So. 3d 359, 365 (Ala. Civ. App. 2011) (quotation marks omitted).  A term not defined in a covenant or lease is not necessarily ambiguous.  See Twin City Fire

30

Ins. Co. v. Alfa Mut. Ins. Co., 817 So. 2d 687, 692 (Ala. 2001).  "[W]here

questions arise as to the meaning of an undefined word or phrase, the court should

simply give the undefined word or phrase the same meaning that a person of

ordinary intelligence would give it."  Id.  A dictionary definition of a word is "the

interpretation that ordinary people would give [it]."  Carpet Installation & Supplies

of Glenco v. Alfa Mut. Ins. Co., 628 So. 2d 560, 562 (Ala. 1993).

If, however, "a term is reasonably subject to more than one interpretation," it

is ambiguous.  See Hipsh v. Graham Creek Estates Owners Ass'n, Inc., 927 So. 2d

846, 849 (Ala. Civ. App. 2005) (alteration and quotation marks omitted).  And

where the language of a restrictive covenant is ambiguous, "its construction will

not be extended by implication or include anything not plainly prohibited and all

doubts and ambiguities must be resolved against the party seeking enforcement."

Moon, 86 So. 3d at 365 (quotation marks omitted).  Just as in Florida, in Alabama

restrictions on the use of real property are not favored and are strictly construed in

favor of the free use of property.  See Bon Aventure, L.L.C. v. Craig Dyas, L.L.C.,

3 So. 3d 859, 864 (Ala. 2008).

We did not address in our previous opinion whether the terms "groceries"

and "sales area" were ambiguous under Alabama law; we left that determination

up to the district court on remand.  But in discussing whether the terms were

ambiguous under Florida law, we acknowledged that they were not defined in the

grocery exclusive provisions, and that the two terms "appear ambiguous" because "'groceries' appears to admit at least two reasonable interpretations" and "the same could be said of the term 'sales area.'" Winn-Dixie, 746 F.3d at 1022–23. We explained, however, that we could not "assess ambiguity in this case without accounting for what [the 99 Cent] court has said . . . about these very terms." Id. at 1023. We said the terms were not ambiguous as to the Florida stores because that is an issue of Florida law and the 99 Cent court had "[found] these terms to be clear and unambiguous." Id. at 1024.

The 99 Cent decision does not help us "assess ambiguity" in the grocery exclusive provisions for the Alabama stores because that decision "is binding only as a pronouncement of Florida law." Id. at 1026. And, as the district court and the parties acknowledge, there are no Alabama cases defining the terms "groceries" and "sales area" or holding that the two terms are clear and unambiguous.

We need not rehash our previous decision in this case to determine that, without any binding authority holding that the terms are unambiguous, "groceries" and "sales area," as used in Winn-Dixie's grocery exclusive provisions, are open to more than one reasonable interpretation under Alabama law. Id. 1022–23. It is enough to say that, in that state the term "groceries" could reasonably be interpreted as referring to food only or to food plus nonfood products, and "sales area" could reasonably be interpreted as referring to the physical space occupied

32

by shelves or to that shelf space plus aisle space.  Id.  And although we stated in our previous opinion that "a review of [three] dictionaries reveals no evidence of a contrary or changing definition" of "groceries" from the definition of "groceries" that the 99 Cent court provided, see id. at 1025, we cannot say with assurance that Alabama courts would reach the same conclusion.  An Alabama court could consult dictionaries other than those three, which might define the term "groceries" to include only food products sold at a grocer's store.  Although the dictionaries that the 99 Cent court and this Court consulted did not define the term that narrowly, we recognize the possibility that other dictionaries may do so.[10]

Winn-Dixie argues that, even though "99 Cent is not controlling in Alabama, . . . its analysis is equally applicable" because Alabama courts also look to the dictionary to determine the plain meaning of terms.  We agree that Alabama courts would engage in an analysis similar to that of the 99 Cent court and would likely resort to dictionaries to define "groceries" and "sales area" because those two terms are not defined in the grocery exclusives provisions.  But Alabama courts might reach a different conclusion than the Florida court did in 99 Cent and decide that the term "groceries" is ambiguous.  And they could conclude that, because

---

[10] For example, the district court mentioned a definition of "grocery" from the Oxford American College Dictionary (2002), which defined the term as "a grocer's store or business; items of food sold in such a store."

"sales area" is not defined in dictionaries and is reasonably subject to more than one interpretation, that term is also ambiguous.

Without any binding Alabama authority similar to Florida's 99 Cent decision, which held that the two terms have a "plain and ordinary meaning," see 99 Cent, 811 So. 2d at 722, we are left to decide ourselves and we agree with the district court that the terms are ambiguous because they are reasonably subject to more than one interpretation. The ambiguity of those two terms in Alabama "must be resolved against" Winn-Dixie, the party seeking enforcement, and in favor of the free use of real property. See Moon, 86 So. 3d at 365 (quotation marks omitted). Because the district court correctly decided that, we will affirm the judgment as to the Alabama stores.

## V.  CONCLUSION

We **REVERSE** the district court's judgment as to the Dollar General and Big Lots stores in Florida and **REMAND** with instructions for the court to apply to those stores, which had leases dated before February 20, 2002, the same definitions of "groceries" and "sales area" that it applied to the Florida stores with leases dated after February 20, 2002.[11]  We **AFFIRM** as to the Alabama stores.

---

[11] Those definitions, as the district court articulated them, are as follows:  The term "sales area" includes "fixtures and their proportionate aisle space."  The term "groceries" includes "food (excluding prepared foods) and beverages (excluding alcoholic beverages) as well as 'many household supplies (as soap, matches, paper napkins).'"  And "household supplies" that are "groceries" include items "associated with the preparation and service of food, as well as the maintenance of a clean kitchen (as the primary place where food is prepared)."

34

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**