PITTMAN, Judge.
Vestlake Communities Property Owners’ Association, Inc., and Liberty Park Master Owners’ Association (hereinafter collectively referred to as “the Association”)[1]; as well as the Liberty Park Architectural Review Committee (“the ARC”), appealed from an order of the Jefferson Circuit Court denying their request for permanent injunctive relief against homeowners Ronald T. Moon and Sarah P. Moon based on the Moons’ alleged violation of a restrictive covenant applicable to their property.[2] The supreme court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). We affirm.

Factual and Procedural Background

The Moons live in the Liberty Park development of Vestavia Hills. The legal description of the Moons’ property is “Lot 341 of Vestlake Village, 7th Sector, Phase 2, as recorded in Map Book 201, Page 38, in the Office of the Judge of Probate of Jefferson County, Alabama” (the document recorded in the Jefferson County Probate Office is hereinafter referred to as “the plat”). Lot 341 is located on a peninsula that juts into Lake Reynolds, a man-made body of water owned by Liberty Park Joint Venture (an entity that was not a party below). The Moons’ property is subject to the “Covenants, Conditions and Restrictions” of the Association. Among other things, the covenants authorize the ARC to approve all plans and specifications for improvements to any lot.
In January 2010, the Moons submitted to the ARC a proposed plan for a two-story addition to the east side of their house. The ARC approved the plan in March 2010 and notified the Moons that *362 they would be required to submit a landscaping plan to accompany the construction plan. The Moons subsequently submitted a landscaping plan that, among other things, called for a series of stone walkways and six stone patios to be constructed along the lake. The ARC approved the landscaping plan in June 2010, with a notation stating that “additional stone work cannot project past existing] water’s edge” and providing that, “[i]f you go past water’s edge, you will be required to remove.”
Before beginning work on the lakeside patios, John Saunders, the Moons’ landscaping contractor, staked out the six areas where the patios would be located, marking the then-existing water’s edge. According to Saunders, the water level of the lake fluctuated 18 to 22 inches during the time he was building the walkways and patios for the Moons. Saunders said the lake level rose and fell daily, and the line at which the land area of Lot 341 met Lake Reynolds was “a moving target.” He acknowledged that, in some places, the stonework extended two or three feet past the staked line because “there was so much silt or whatnot that [had] washed off the shore ... [that] we had to be able to come in and make sure [the stonework] was going to have a good solid foundation to support it.”
On August 1, 2010, two members of the ARC visited the Moons’ property to investigate the progress of the construction and landscaping projects. Upon finding that some of the stone work patios “extended into the lake,” the ARC issued an immediate notice of violation to the Moons and a stop-work notice to the Moons’ construction and landscaping contractors. The notices required that the patio additions extending into the lake be removed immediately and that all construction personnel — including those who had been working only on the addition to the Moons’ house — leave the job site until the patio violations were remedied.[3]
Sam Lowery, the chairman of the ARC, testified that the ARC considered the lake boundary line of Lot 341 to be the boundary as shown on the plat, which measures “269 +/- feet” based on a lake elevation of 586 feet. According to the testimony of Walter Schoel, a civil engineer who designed Lake Reynolds, the source for the lake boundary line on the plat is a contour line on an aerial topographic map reflecting an elevation of 586 feet above sea level. Schoel explained that the boundary of a lake is designated on a plat by a contour line, which, Schoel said, is an approximate dimension based on the lake’s normal pool and which cannot be surveyed because it is slightly variable over time.
Schoel testified that the topographic map that formed the basis for the contour line on the plat was not completely accurate because, he said, the “586 contour line” on that map reflects where the water line is supposed to be when the lake is at full pool, whereas the service spillway for the lake is actually set at 586.35 feet— *363 meaning that, if the lake is full, the water is .35 foot (or approximately 4 inches) higher than the elevation reflected on the plat. Schoel acknowledged that, when lake levels rise or fall vertically by only a few inches, the horizontal effect of the change in water level — that is, the change in the place where the water meets a sloping embankment on land — can be much more dramatic, amounting to as much as a “five or six-foot” difference in the position of the water’s edge.
Thomas R. Holcomb, a landscape architect and a member of the ARC, testified that, by virtue of paragraph 2.E. of Amendment 6 to the covenants, homeowners are on notice that lake levels may rise or fall. That section states:
“Water Level Fluctuations. By acceptance of a lake lot deed, each owner of a lake lot acknowledges that the water level of the lake is subject to significant fluctuations and that portions of the lake lots may from time to time be flooded and that from time to time the level of the lake may be too low to accommodate recreational uses. Neither Developer, nor the Master Association, nor the Association shall have any responsibility whatsoever for maintaining the lake at any particular or certain water level.”
Holcomb acknowledged that the term “water’s edge” is somewhat imprecise because, he said, the water level of the lake varies a few tenths of an inch — a vertical variance that, Holcomb concluded, could result in a horizontal variance of one or two feet with respect to the point at which the water meets the land. For that reason, Holcomb explained, the ARC had routinely allowed homeowners a one- or two-foot “grace area” for construction of docks and piers past the apparent water’s edge.
On August 16, 2010, the Moons hired civil engineer and land surveyor Lawrence D. Weygand to conduct an “as-built” survey of Lot 341. The ARC reviewed Wey-gand’s survey and concluded that three of the six stone patios crossed the contour line on the plat (thereby extending past the water’s edge, according to the ARC) by distances of two and one-half feet, four feet, and six feet, respectively. The ARC hired Weygand to return to the property to “run some elevations” on the stone patios and on the lake and to “check[] the overflow structure” for the lake.[4] On August 25, 2010, Weygand determined that the overflow structure was set at 586.35 feet and that the lake elevation that day was 586.58 feet, or almost 7 inches higher than the elevation that is the basis for the contour line on the plat. Weygand testified that the Moons’ counsel had asked him to take the lakeside boundary line as shown on the plat and to superimpose it onto the survey of Lot 341 that he had performed on August 10, 2010. Weygand testified that, by using a vellum overlay and photocopying the contour line on the plat at a size that corresponded to the scale of his survey, he had determined that two of the Moons’ patios at issue did not extend past the lake boundary as shown on the plat but that the third patio at issue did extend “approximately four feet” past the lake boundary as shown on the plat.
On September 15, 2010, the Association and the ARC filed a complaint seeking a preliminary injunction and a permanent injunction to enforce the restrictive covenants on the Moons’ property and to require the Moons to remove the stone patios that allegedly extended past the water’s *364 edge.[5] On October 1, 2010, the trial court entered a preliminary injunction and set the claim for permanent injunctive relief for a November 8, 2010, hearing. On November 3, 2010, the Moons answered the complaint and counterclaimed, alleging several tort claims that remain pending in the trial court.
Following a two-day hearing, the trial court conducted a site visit of the Moons’ property. On November 24, 2010, the trial court entered a lengthy and comprehensive order, denying the Association’s request for permanent injunctive relief and allowing the Moons to recommence all work on their property. The trial court concluded (a) that the term “water’s edge” was ambiguous and that the ambiguity should be resolved against the Association; (b) that the Association had failed to establish that it would suffer irreparable injury unless a permanent injunction were granted; and (c) that “any de minimis benefit that would accrue to the [Association from granting injunctive relief] would be greatly outweighed by the adverse impact to the Moons, including the economic waste that would result from tearing up the patios and the continued unsafe condition created at the Moons’ home as a result of the work-stoppage order.” This timely appeal followed on December 7, 2010.[6]

Standard of Review

“ ‘To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest.’
“TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1242 (Ala.1999), overruled on another point of law, Holiday Isle, LLC v. Adkins, 12 So.3d 1173 (Ala.2008). The entry of a permanent injunction is reviewed de novo, TFT, Inc., 751 So.2d at 1241; however, [the supreme court] has recognized that ‘a trial court’s consideration of ore tenus testimony has a bearing upon the standard of review [an appellate court applies] to the entry of a permanent injunction.’ Classroomdirect.com, LLC v. Draphix, LLC, 992 So.2d 692, 701 (Ala.2008). See also Kappa Sigma Fraternity v. Price-Williams, 40 So.3d 683 (Ala.2009) (according a presumption of correctness to portions of the trial court’s decision based on representations of counsel regarding a settlement agreement where a permanent injunction was issued).”
Sycamore Mgmt. Group, LLC v. Coosa Cable Co., 42 So.3d 90, 93 (Ala.2010). Thus, to the extent that a trial court’s decision on a request for injunctive relief is based on disputed ore tenus evidence,
“a presumption of correctness exists as to the trial court’s findings on issues of fact, and a judgment based on such findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. E.g., Traweek v. Lincoln, 984 So.2d 439, 442 (Ala.Civ.App.2007). That said, a presumption of correctness is not indulged when the trial court improperly *365 applies the law to the facts, nor when the pertinent question involves the application of law to essentially undisputed facts. Id. at 442-43.”
Maxwell v. Boyd, 66 So.3d 257, 258-59 (Ala.Civ.App.2010)
The Association first argues that the trial court erred in concluding that the Moons had not violated the covenants because, it says, the great weight of the evidence indicated that three of the Moons’ six stone patios extended into the lake a distance of two and one-half feet, four feet, and six feet, respectively, and, it maintains, the evidence was undisputed that at least one patio extended four feet beyond the Moons’ property line.

Discussion

“[W]hen the language of a restrictive covenant is not ‘of doubtful meaning and ambiguous,’ the language of that covenant ‘is entitled to be given the effect of its plain and manifest meaning.’ ” Maxwell, 66 So.3d at 261 (quoting Laney v. Early, 292 Ala. 227, 231-32, 292 So.2d 103, 107(1974)). However,
“ ‘ “[w]here the language [in a restrictive covenant] is ambiguous, ‘its construction will not be extended by implication or include anything not plainly prohibited and all doubts and ambiguities must be resolved against [the party seeking enforcement].”” Smith v. Ledbetter, 961 So.2d [141,] 146 [(Ala.Civ.App.2006)] (quoting Greystone Ridge Homeowners’ Ass’n, Inc. v. Shelton, 723 So.2d [88,] 90 [(Ala.Civ.App.1998)], in turn quoting Bear v. Bernstein, 251 Ala. 230, 231, 36 So.2d 483, 484 (1948)).”
Traweek v. Lincoln, 984 So.2d 439, 447 (Ala.Civ.App.2007).
“ ‘In written instruments, two types of ambiguities can arise: a patent ambiguity and a latent ambiguity. McCollum v. Atkins, 912 So.2d 1146, 1148 (Ala.Civ.App.2005). A patent ambiguity results when a document, on its face, contains unclear or unintelligible language or language that suggests multiple meanings. Thomas v. Principal Fin. Group, 566 So.2d 735, 739 (Ala.1990). On the other hand, “[a]n ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.” Id.’ ”
Grove Hill Homeowners' Ass'n v. Rice, 43 So.3d 609, 614 (Ala.Civ.App.2010) (quoting Smith v. Ledbetter, 961 So.2d 141, 145 (Ala.Civ.App.2006)). “[W]hether a latent ambiguity exists is a question of law we review de novo.” Id. at 615. We hold that, based upon the evidence adduced at the hearing, the trial court correctly determined that there was a latent ambiguity in the ARC’S use of the term “water’s edge” that required interpretation.
ARC members Lowery and Holcomb recognized that the term was imprecise and could not be given a literal meaning. They conceded that the plat designated the lakeside boundary as 269 feet with a “plus- or-minus” qualifier; they admitted that the lake level fluctuated; and they acknowledged that the ARC had given homeowners the benefit of the doubt regarding the lake boundaries of their lots by granting them a one- or two-foot “grace area” in which to build piers and docks past the apparent water’s edge. The trial court concluded:
“Testimony indicated that the [ARC] routinely [has] permitted construction to extend past the water’s edge, and past the boundaries of various properties by one to two feet pursuant to an unwritten ‘grace area,’ even when the express terms of the subject approvals stated that construction could not so extend, as *366 was the case with the Moons’ Landscape Plan. This practice leads the Court to conclude that the term ‘waters edge,’ and the underlying covenant language relating thereto, are ambiguous and therefore subject to interpretation. As discussed hereinafter, this Court interprets this language such that the patio construction violates neither the covenants nor the approved Landscape Plan.”
Weygand (the surveyor), Schoel (the civil engineer), and Saunders (the Moons’ landscaping contractor) all acknowledged the difficulty of pinpointing the water’s edge. According to Weygand — upon whose initial survey the ARC had relied in determining that three of the Moons’ patios were in violation of the covenants because they extended two and one-half feet, four feet, and six feet, respectively, beyond the Moons’ boundary line — after he had superimposed the vellum overlay he had prepared onto his as-built survey of the Moons’ property, it appeared to him that two of the Moons’ patios at issue were not in violation of the covenants at all and that the third patio at issue was four feet over the boundary. On this point, the trial court concluded:
“This Court finds it to be significant that the [Association] stipulated in their complaint that the plat establishes the boundary of the Moons’ property but now ask[s] the Court to disregard a vellum overlay version of the same plat presented by Mr. Weygand. The Court finds the overlay was persuasive evidence that at most, one portion of one patio may have extended up to four feet beyond the Moons’ lakeside border as shown on the plat. This distance is within what this Court finds to be the patent “+/-’ element shown on the plat.”
(Emphasis added.)
The trial court evidently credited, as was its prerogative, the following margin-of-error testimony by Schoel: that the actual point at which the Moons’ land touched the lake could vary by as much as five or six feet from the lake boundary as shown on the plat because of the inherently imprecise method by which the lake boundary contour line on the plat was created. In its findings of fact, the trial court stated:
“14. The lake boundary was created by transposing an aerial topographic survey onto a survey drawing of the subdivision so as to create the solid-lined lake border for each lakefront lot on the plat. As established by the expert testimony of the [Association’s] hydrologist, setting the lake boundary from an aerial topographic survey creates a situation whereby the actual water’s edge could vary from the lake boundary as depicted on the plat by ‘five or six feet horizontally].’ The actual level of Lake Reynolds was not ‘shot’ by a surveyor when the Plat was created.”
(Emphasis added.) We accord that finding a presumption of correctness because it is not “clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.” Maxwell, 66 So.3d at 258.
In its findings of fact, the trial court also stated:
“The ... ‘service spillway’ serving as the receiving device for water within Lake Reynolds has an elevation of 586.35 feet. Because the lake must be higher than 586.35 feet for water to drain into this device, ‘normal pool’ for Lake Reynolds exceeds 586.35 feet. On August 25, 2010, surveyor Weygand established that Lake Reynolds had an elevation of 586.58 feet, suggesting that the “water’s edge’ is at a different location from where it is recorded on the plat.”
*367 That finding indicates that the trial court chose to believe the testimony of Weygand and Sehoel over the testimony of ARC chairman Lowery, who said that the vertical water level of the lake varied by only “a few tenths of an inch” from what is recorded on the plat and, therefore, could account for only a one- to two-foot horizontal variance with respect to the point at which the water meets the land.
“It was within the province of the trial court to consider the credibility of the witnesses, to draw reasonable inferences from their testimony and from the documentary evidence introduced at trial, and to assign such weight to various aspects of the evidence as it reasonably may have deemed appropriate.... In order to reverse the trial court ..., we would have to make our own credibility determinations and we would have to reweigh the evidence, neither of which we are allowed to do.”
Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala.Civ.App.2005).
The trial court’s findings as to the location of the Moons’ lake boundary are due additional deference because they were based, in part, upon the trial court’s visit to the property. See Southwestern Constr. Co. v. Liberto, 385 So.2d 633, 635 (Ala.1980) (stating that “[a] determination made by the trial court, when evidence is taken ore tenus, is favored with a presumption of correctness and will not be disturbed on appeal unless plainly erroneous or manifestly unjust, especially where ... the trial judge has made a personal inspection of the premises” to determine whether the defendant’s activities constituted a nuisance and violated restrictive covenants to which the property was subject). The trial court’s order states:
“[T]he Court conducted a site visit of the [Moons’] property on November 12, 2010. At that time, the Court personally walked the relevant portions of the Moons’ property; in particular, the Court examined the recently constructed patio areas and the areas where construction work on the Moons’ home was suspended. From the Moons’ property (and in some instances with the assistance of binoculars), the Court also viewed Lake Reynolds, its dam and drainage devices, and several surrounding lakefront properties on Lake Reynolds. The site visit significantly benefitted the Court, and it serves as a substantial basis for this order.”
The Association next contends that the trial court erroneously applied the law to the facts in the following respects: (a) by relying on evidence indicating that the Association had allowed other property owners to violate the covenant that prohibits building into the lake as a basis for refusing to enforce the covenants applicable to the Moons’ property; (b) by improperly balancing equities by weighing an alleged hardship to the Moons (which hardship, the Association says, was unsupported by the evidence) against an erroneous determination that the Association had suffered no comparable hardship; and (c) by applying the relative-hardship doctrine to the Moons when, the Association says, any hardship suffered by the Moons was self-inflicted.
We have reviewed de novo the trial court’s determination that the Association failed to establish success on the merits of its covenant-violation claim, taking into account the fact that the trial court’s decision was based, in part, on ore tenus testimony and a site visit to the Moons’ property, and we conclude that the trial court’s determination is due to be upheld. Having concluded that the trial court properly determined that Association’s claims failed on the merits, it is unnecessary for this court to decide whether the trial court’s determi *368 nation was correct with respect to the Association’s arguments (b) and (c) above because those arguments relate to whether the Association proved the other elements necessary to entitle it to a permanent injunction. Therefore, we pretermit any discussion of those issues.
In support of argument (a) above, the Association cites Tubbs v. Brandon, 374 So.2d 1358, 1361 (Ala.1979), for the general rule that “[o]ne will not be es-topped from enforcing restrictive covenants just because he has previously allowed others to deviate in minor respects from the covenants.” The Association maintains that the trial court erred in implying that the Association had waived its right to insist upon removal of the Moons’ lakeside patios by ignoring the piers and docks erected by other property owners. In its findings of fact, the trial court stated:
“19. In response to a query by the Court, Lowery [the chairman of the ARC] testified that the ARC ‘just sort of ignor[es]’ certain provisions of the covenants, in particular those in Amendment No. 6.2.B, pertaining to the covenants’ prohibition on building bulkheads, piers, or docks. In other words, the [Association has] permitted other residents to construct piers and docks [that extend into the lake].”
The trial court did not violate the Tubbs rule because it did not determine that the evidence in question established waiver or estoppel by the Association. Instead, the trial court determined that the evidence in question tended to shed light on whether the term “water’s edge” was ambiguous and, therefore, subject to interpretation. In the conclusions-of-law section of its order, the trial court stated:
“In order to prevail in [its] petition for injunctive relief, the [Association] must first show that the Moons violated the covenants. [It has] failed to prove a material violation thereof. The evidence showed that the [Association’s] enforcement of the covenants has been inconsistent. While this inconsistent conduct alone cannot be held to estop the [the Association] from enforcing the covenants, it is a relevant factor as this Court weighs the equities. What the Court finds persuasive, as suggested above, is that the [Association] failed conclusively to establish a direct violation of the terms of the approved landscape plan that prohibits building past the “water’s edge.’ ”
(Emphasis added.)
For the foregoing reasons, the trial court’s order denying the Association permanent injunctive relief is affirmed.
AFFIRMED.
THOMPSON, P.J., and BRYAN and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The evidence indicated that members of the Vestlake Communities Property Owners’ Association are also, by virtue of that membership, members of the Liberty Park Master Owners’ Association.

. On November 24, 2010, the trial court determined that the ARC "was not a legal entity with the capacity to sue” and, therefore, dismissed the ARC as a plaintiff. Because no argument has been made that the trial court erred in so ruling, we conclude that the ARC is not a proper appellant, and we have, therefore, restyled the appeal.

. The ARC contends that the Moons violated section 5.07 of the covenants, which provides:
"5.07 Construction Without Approval. If ... the ARC shall determine that any approved plans and specifications for any improvements or the approved landscaping plans for any lot or dwelling are not being complied with, then ... the owner of such lot or dwelling shall be deemed to have violated these covenants and the ARC shall have the right to exercise any of the rights and remedies set forth in Section 5.13 below.”
Section 5.13 authorizes the ARC to
"enjoin any further construction on any lot or dwelling and require the removal or correction of any work in place which does not comply with the plans and specifications approved by the ARC for such improvements.”

. The device that Weygand called the “overflow structure” is the same device that Schoel referred to as the "service spillway.”

. See supra note 2.

. Despite the fact that the trial court did not adjudicate the Moons' counterclaims, this appeal is properly before us because Rule 4(a)(1)(A), Ala. R.App. P., authorizes an appeal to be taken from an order "granting, continuing, modifying, refusing, or dissolving an injunction, or refusing to dissolve or to modify an injunction.” See Kappa Sigma Fraternity v. Price-Williams, 40 So.3d 683, 689-90 (Ala.2009).