THOMAS, Judge, dissenting.
J.P. ("the father") has appealed a judgment of the Jefferson Juvenile Court, Bessemer Division, ("the juvenile court"), finding Ja.P. ("the child") dependent and awarding her custody to M.P. ("the maternal aunt"). Although I agree with the portion of the main opinion discussing the threshold issue of the father's request to proceed on appeal in forma pauperis, because I would affirm the juvenile court's judgment, I respectfully dissent. In my opinion, much of what Judge Donaldson expressed in a recent special writing is equally applicable in this case:
"The judgment in this case was entered after a trial conducted in accordance with the requirements of law. From my review of the record and the [father's *876 appellate] brief ..., I am unable to identify any procedural irregularities or substantive errors of law that occurred during the proceedings that would permit an appellate court to reverse the judgment as to the issue of [dependency]. Thus, the judgment, insofar as it addresses [dependency], may not be reversed without overturning the trial judge's assessment of the credibility of the witnesses. The law does not permit this court to do so.
" 'It was within the province of the trial court to consider the credibility of the witnesses, to draw reasonable inferences from their testimony and from the documentary evidence introduced at trial, and to assign such weight to various aspects of the evidence as it reasonably may have deemed appropriate .... In order to reverse the trial court ..., we would have to make our own credibility determinations and we would have to reweigh the evidence, neither of which we are allowed to do.'
" Vestlake Cmtys. Prop. Owners' Ass'n, Inc. v. Moon, 86 So.3d 359, 367 (Ala. Civ. App. 2011) (quoting Miller v. Associated Gulf Land Corp., 941 So.2d 982, 990 (Ala. Civ. App. 2005) ).
"Reasonable judges might disagree .... These types of cases 'are among the hardest to deal with and courts are seldom satisfied in all respects with the results reached.' Mothershed v. Mothershed, 348 So.2d 501, 502 (Ala. Civ. App. 1977). But only one judge actually saw and heard the parties and the witnesses, and that is the trial judge. Resolving disputed facts in highly emotional cases affecting lives, liberty, or property is part of the job placed squarely upon the trial judge's shoulders because that judge personally interacts with the people involved. Deferring to such decisions of the trial judge is not a matter of courtesy or protocol. It is a recognition that decisions based on assessments of the traits and character of people-e.g., where a child lives or with whom a child visits, whether a criminal defendant receives probation, the extent of pain felt by an injured employee, etc.-are best left to the judge who has actually seen and heard from the people involved and should not be made on cold records from distant offices.
" '.... It is an awesome responsibility, fraught with difficulty, to determine the best welfare of children. The trial judge observes attitudes, facial expressions, voice tones and all human traits in parties and witnesses testifying and appearing before him, weighs the evidence, wishes for the wisdom of Solomon, and hopefully reaches the correct decision in the case. This unique opportunity to observe and hear is the primary reason for the strong presumption favoring the trial court's findings in cases of this nature.'
" Ashley v. Ashley, 383 So.2d 861, 863 (Ala. Civ. App. 1980) (citing Mothershed, supra )."
T.G.F. v. D.L.F. [Ms. 2150607, April 28, 2017] --- So.3d ---- (Ala. Civ. App. 2017) (Donaldson, J., concurring specially)(bracketed language and some ellipses added).
In its judgment, the juvenile court determined that the child was dependent based on the evidence presented regarding the father's "violent temper and anger issues," his custom of sleeping in the same bed with the child, his refusal to obtain a valid driver's license, and his lack of stable employment.[7] In reaching that determination, *877 the juvenile court cited § 12-15-102(8) a., Ala. Code 1975, but it did not specify a particular basis or bases for its adjudication of dependency. In such situations, "[an appellate court] will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court." Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala. 2003).
Background
The evidence supporting the juvenile court's judgment was presented at a February 27, 2017, trial, which revealed the following.[8] The record indicates that the child was 10 years old at the time of the trial. The maternal aunt testified that the child had been living with C.H. ("the mother"), the child's brother ("the brother"), and the child's sister ("the sister") until August 2016, when the mother was discovered burned to death in an abandoned apartment. She testified that the brother, who was 19 years old at the time of the trial, had been charged with murdering the mother. After the mother's death, the child and the sister began living with the maternal aunt and her husband, D.P. ("the maternal uncle"). The child remained in their care "for about a week and a half to two weeks," after which time the child began living with the father. At that time, the maternal aunt and uncle decided to initiate the dependency action because, the maternal aunt said, she believed the child was in danger living with the father.
The maternal aunt said that, at the time of the trial, she had known the father for more than 20 years and that she had lived with the mother, the father, and their collective children in the past "for about five or six years." The maternal aunt also said that the mother, the child, the brother, and the sister had lived with her for about a year after the mother and the father had separated, which had been about five years before the trial. When asked by her attorney what had given her concern regarding the father's ability to parent the child, the maternal aunt indicated that the father could not manage his anger effectively and that "[h]e has a tendency of being violent." During voir dire by the father's attorney, the maternal aunt testified that, after the mother's death in August 2016, the father had been speaking with the maternal uncle and "another guy" when the father "blew up and got angry." The maternal aunt denied that the father's anger during that incident had been directed toward her or the maternal uncle as a result of the dependency action, explaining that, at that *878 time, the father had agreed that allowing the child to reside with the maternal uncle and aunt "was the best thing."
When the maternal aunt testified that she was also aware of incidents regarding the father's temper that had occurred more than five years before the date of the trial, the father's attorney objected to the admission of that testimony, arguing that it was irrelevant. In overruling the objection, the juvenile court explained: "[I]f any party who is seeking to have custody of this child has a history of anger management and child abuse[,] that is very relevant ... to this court [-b]e it five, ten, or fifteen years ago, [or] what happened in that intervening time."
The maternal aunt said that the mother and the father had separated about five years before the date of the trial. She testified that, during the time that she had lived with the mother and the father and their collective children, which she said had been about 15 years before the date of the trial, she had witnessed the father being violent toward "[p]retty much all of [them]." She said that, on multiple occasions, the father had punched walls, torn furniture, or broken a table. She also testified that, since the child's birth, she had seen the father be violent with the mother and the brother; she said that the father had grabbed the brother and pushed him against the wall.
The maternal aunt also said that the father had been unable to maintain housing or financial stability. Specifically, she said that the father had "moved around a lot" and that he had not possessed a driver's license or a steady mode of transportation. She testified that the father had not maintained a relationship with the child or supported the child financially before the mother's death, although she admitted that he had visited the child when the mother "would ask him to or provide gas for him to get [the child] or pick up money to take her out." She said that, to her knowledge, the father had not visited the child, the brother, or the sister, except when the mother had given him money to take them out. The maternal aunt said that, in her opinion, the child should undergo counseling after the mother's death and that she had offered to pay for such counseling, but, she said, the father had not allowed the child to attend counseling.
After the child had begun living with the father, the maternal aunt said, the father had eventually decreased the frequency with which the child visited the maternal uncle and aunt. The maternal aunt said that the father's decision in that regard had been made after he had received "a letter," at which time she had had a telephone conversation with the father. She testified that she had told the father that, "[i]f he wanted to receive some type of check or something, he could[,] and [the child] could stay-continue to stay with me." The father, however, "wanted [the child] to stay with him."
The sister, who was 24 years old at the time of the trial, also testified. She said that she and the child had a close relationship and that the child confided in her. The sister testified that, after his separation from the mother, the father had "just kind [of] bounced around." She explained that the father would sometimes live with his girlfriend and other times with his mother ("the paternal grandmother"). After the mother and the father separated, the sister said, she "[r]eally didn't see much of [the father] or talk to him much." She testified that, before the mother's death, the child had sometimes spent the night with the father and that the father had spent time with the child "maybe like two weekends out of a month. Not very often." When asked by the maternal uncle and aunt's attorney to describe the father's behavior toward her, the mother, and her siblings, *879 the sister testified: "He was very angry all the time[,] especially with my brother. He was very violent."
The sister said: "I've seen [the father] choke my brother. I've seen him pick him up by his neck. I've ... seen him spit in his face. He's punched him. He's bit him in the face." The sister testified that the child had been present during those incidents. When asked whether the father had committed an act of violence against the child, the sister said that, when the child "was really small," the father had "reach[ed] back in the car in her car seat and hit her really hard." The sister testified that, when she and the child and the brother were younger, there "were a few times" when she had called the police to their home because the father was abusing the mother. The sister testified that she believed the child was in immediate danger. She explained: "I don't think [the father] can take care of her[,] and he's a violent person."
During an in camera interview, the child testified that she, the father, the paternal grandmother, and the father's girlfriend and her children, specifically her two teenage sons, lived in the paternal grandmother's house. She testified that the girlfriend was there every day and slept there every night. She said that she wanted to live with the father during the week and with the maternal aunt on weekends. During examination by her guardian ad litem, however, the child also recalled having told her guardian ad litem sometime before the trial that she had wanted to live with the maternal aunt. When asked why her preference had changed at the time of the trial, the child said that there were "children outside" where the father lived and that the maternal aunt's home was sometimes "boring."
The child testified that the father would sometimes "get mad and ... yell, but he'll calm himself down." She said that the father would sometimes yell at his girlfriend and her children. At one point during her testimony, the child referred to the father's girlfriend's teenage sons as "my brothers." During examination by the juvenile court, the child testified that she and the father slept in the same bed every night and that the father's girlfriend and her children slept in the same room.
The paternal grandmother testified that her house had three bedrooms and two bathrooms. The paternal grandmother said that the father's girlfriend and her children stayed at her house "[m]aybe three times a week" and "maybe on the weekends some." She said that, although she owned the house where she, the child, and the father lived, she had not always lived there. Before the mother's death, the paternal grandmother had lived in Hoover, and she had returned to her house after the mother's death to live with the father and the child, she said, so that she "could help."
Before her return to her house, the paternal grandmother testified, the father had been living in the house with his brother. She testified that the father's brother had since been incarcerated for "[c]onspiracy .... to sell drugs" and, after his arrest, had told her: "[M]om, I want you to move back home." She said: "I moved back to the house because I didn't want everything tore up and I wanted to be there to see what was going on, you know. But I trusted [the father], but ... also my son that's incarcerated asked me to move back home. That's one reason I moved back home." During examination by the juvenile court, the paternal grandmother testified that she believed it was a "problem" that the father's girlfriend slept in the same room as her teenage sons when they spent the night in her house, but she did not believe it was a problem for the father to sleep in the same bed as the child. The paternal grandmother's sister *880 also testified, and she corroborated portions of the paternal grandmother's testimony.
The father's testimony at trial either disputed or discounted the significance of much of the testimony elicited from the maternal aunt and the sister. He testified, however, that he had never attended anger-management classes or received counseling, stating: "I rarely ever get mad"; he said that he did not plan to attend anger-management classes in the future. He testified that he had been arrested for possession of a controlled substance approximately 10 years before trial but also stated that he "[n]ever did drugs."
The father denied that his girlfriend and her children lived with him but admitted that she "[s]pends the night sometimes" and that his girlfriend's children had "spen[t] the night ... several times." He said that his girlfriend had "her own place." The father testified that he had slept in the same bed as the child only because "[s]he'll come knock on my door sometimes and ask [him]." The father said that he had his own bedroom and that "everybody got queen size beds and sixty inch TV's in their room."
The father's testimony also indicated that, although he could work full-time, he had intentionally chosen to work only 30 hours each week because, he said, he wanted to be able to pick up the child from school. He said he earned $350 cash per week or about $1,400 per month. The father testified that he received $250 in food stamps each month for himself and the child and that the child received a check each month for $958 from an unspecified source. The father stated that he had not accurately reported his weekly income when applying for food-stamp benefits.
The father also admitted that he had not possessed a valid driver's license "in so long," specifically 21 years, because he had not obtained glasses or paid a $77 fee. He said: "I can get them, but I just ain't do it." He admitted that he had driven in his mother's automobile with the child.
Although he said that, during the mother's funeral, the child was "taking it hard," he testified that the child had seen a counselor only one time since the mother's death. At the time of the trial, the father could not recall the name of the counselor that the child had seen or where the counselor had been employed. He specifically testified as follows when asked if he had taken the child to see a counselor: "Yes, one time. But the school counselor been-see, I've been having to try and pay for lawyers and stuff. So, I couldn't afford to just do it." Regarding the discrepancies between his testimony and the allegations of the maternal uncle and aunt, the father said: "I feel like I'm the only one telling the truth up here."
Analysis
In reversing the juvenile court's judgment, the main opinion relies in large part upon testimony elicited from the father and the paternal grandmother. The juvenile court, however, was not obligated to believe the testimony of the father and the paternal grandmother. See Bunn v. Bunn, 628 So.2d 695, 697 (Ala. Civ. App. 1993) ("In determining the weight to be accorded testimony, the trial court, as sole judge of the credibility of witnesses, considers the demeanor and apparent candor or evasiveness of the witnesses, and the trial court may disbelieve and disregard portions of testimony and should accept only that testimony it considers worthy of belief."). Conflicts existed in the testimony presented regarding, among other things, the father's history of domestic violence.
Section 30-3-131, Ala. Code 1975,[9] provides, in its entirety:
*881 "In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence. Notwithstanding the provisions regarding rebuttable presumption, the judge must also take into account what, if any, impact the domestic violence had on the child."
See also J.P. v. T.H., 170 So.3d 681, 683 (Ala. Civ. App. 2014) (applying § 30-3-131 when reviewing a judgment entered in a dependency action not involving the Department of Human Resources).
Based on the testimony presented regarding the father's violence toward the mother and the brother, the latter of which, according to the sister, included choking, punching, and biting, sufficient evidence existed from which the juvenile court could have concluded that the father was a perpetrator of domestic or family violence and that awarding the father sole physical custody of the child was presumptively not in the child's best interest. In considering the impact that the domestic violence had had on the child, I note the evidence presented showing that the father had abused the brother in the child's presence, that the brother had later been charged with murdering the mother, that the father had inappropriately struck the child when she was younger, that the father had abused the mother when the sister was a child, that the father continued to become angry and yell at his girlfriend in the child's presence, that the father continued to become angry and yell at his girlfriend's teenage sons in the child's presence, that the child's bond with the girlfriend's children was such that the child viewed them as siblings, that the father denied having an anger problem at all, and that the father had no intention of correcting his behavior. Thus, I conclude that clear and convincing evidence was presented regarding the impact of the father's domestic violence on the child, such that the presumption that an award of sole physical custody to the father was not in the child's best interest was not adequately rebutted and that the child was therefore without a parent who was able to provide for her care or a parent who was able to discharge his parental responsibilities, such that she was dependent under the relevant portions of § 12-15-102(8) a.2., Ala. Code 1975, or § 12-15-102(8) a.6., Ala. Code 1975.
In reversing the juvenile court's judgment, the main opinion concludes that, as a matter of law, the testimony presented regarding the father's domestic violence that "allegedly occurred years before the proceedings" was insufficient to establish the child's dependency because "his past conduct must be relevant to conditions that would cause the child to be dependent at the time of the disposition." 260 So. 3d at 872. The evidence summarized above shows that, at the time of the trial, the *882 brother, who had been abused by the father as a child, had been charged with murdering the mother, who had been caring for the child before her death. I therefore believe that a determination that the father's history of domestic violence had drastically impacted the child's life and had contributed to the circumstances causing the child to be dependent can be directly inferred from the record.
I also note that this court has rejected similar notions in the past. See T.B. v. Cullman Cty. Dep't of Human Res., 6 So.3d 1195, 1204 (Ala. Civ. App. 2008) ("Although these incidents were somewhat remote in time, they still evidence the character of the paternal grandmother and clearly and convincingly prove that she was not fit and qualified to receive and care for the children."). Moreover, our supreme court has explained that, "[i]n a child custody proceeding, character is obviously in issue and 'evidence touching the character, conduct, and reputation of the parties, or any other evidence tending to throw light on their fitness to be the custodian of the child, is admissible.' " Ex parte Berryhill, 410 So.2d 416, 419 (Ala. 1982) (quoting Milner v. Gatlin, 143 Ga. 816, 85 S.E. 1045, 1047 (1915) ).
Although some of the events described by the maternal aunt and the sister occurred before the father and the mother separated, the maternal aunt testified that the father had not maintained a relationship with the children after the separation, and the sister testified that she "[r]eally didn't see much of [the father] or talk to him much" after the separation. Thus, I do not view their lack of knowledge regarding specific incidents of violence occurring after the father's separation from the mother as an indication that the father had become less violent, but only as an indication that their exposure to the father had been less frequent. In light of, among other things, the evidence presented regarding the father's continued outbursts of anger toward his girlfriend and her children and his refusal to acknowledge his propensity for anger and violence and to take remedial actions, I believe that sufficient evidence was presented to support a determination that the child was dependent.[10]
As already mentioned, both the maternal aunt's and the sister's testimony demonstrated their belief that the father had not been adequately involved in the child's life before the mother's death, and the maternal aunt testified that the father had not maintained a relationship with the child or provided financial support for the child before the mother's death. The maternal aunt testified that, after she and the maternal uncle filed their dependency petition, the father had originally agreed that allowing the child to remain in their custody "was the best thing." She testified that the father had changed his mind after receiving a "letter," at which time she and the father had discussed the father's receipt of "a check" related to his care of the child. The father testified that he receives food stamps totaling $250 each month for himself and the child, that the child receives a monthly check for $958, that he intentionally works only part-time, and that he had inaccurately reported his income on his food-stamps application.
*883 Section 12-15-102(8) a.5., Ala. Code 1975, provides, in relevant part, that a child may be adjudicated dependent if he or she has been abandoned by his or her parent. Section 12-15-301(1), Ala. Code 1975, defines "abandonment" as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
The testimony of the maternal aunt and the sister indicated that the father had withheld from the child at least his maintenance and had failed to adequately perform the duties of a parent after his separation from the mother. Although the father disputed that evidence and it was undisputed that the child had entered his care after the dependency petition was filed, the juvenile court could have determined that the father's testimony was not credible and that his desire to maintain custody of the child had been influenced by the legal privileges that accompanied the child's care. See A.E. v. M.C., 100 So.3d 587, 598 (Ala. Civ. App. 2012) (" ' "We should not equate the filing of 'court papers' and the taking of legal positions with the establishment of human relationships." ' [ Ex parte J.W.B., 933 So.2d 1081, 1092 (Ala. 2005) ](quoting K.W.J. v. J.W.B., 933 So.2d 1075, 1081 (Ala. Civ. App. 2005) (Murdock, J., dissenting) )[ ].").
I next note that § 12-15-102(8) a.3., Ala. Code 1975, provides, in relevant part, that a child is dependent when his or her parent "neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health and well-being of the child." The maternal aunt testified that she believed the child should undergo counseling after the mother's death and the brother's arrest for her murder and that she had offered to pay for such services, but the father had refused. The father testified that the child was "taking it hard" during the mother's funeral but that she had seen a counselor only one time. The father cited a lack of financial ability as the reason he had not secured counseling for the child. Based on the father's other testimony, however, and the testimony of the maternal aunt, sufficient evidence was presented to support a determination that the father had refused to provide counseling for the child, despite having an opportunity and the ability to do so.
Finally, even assuming that, taken alone, each of the categories of evidence described above would not support a dependency determination, I note that § 12-15-102(8) a.8., Ala. Code 1975, provides, in relevant part, that a child may be adjudicated dependent when, "for any other cause, [he or she] is in need of the care and protection of the state." In considering all the foregoing evidence together, in addition to the evidence presented regarding the father's decision to routinely transport the child in an automobile, despite not having a valid driver's license or the visual ability needed to safely operate an automobile under the law, and his custom of sleeping in the same bed as the child under circumstances which, after viewing the witnesses and assessing their demeanor, the juvenile court found particularly troubling and inappropriate, I believe that the juvenile court could have been clearly convinced of the child's dependency. "[O]nly one judge actually saw and heard the parties and the witnesses, and that is the trial judge." T.G.F., 237 So.3d at 227 (Donaldson, J., concurring specially). Based on the evidence contained within this record, I am not persuaded that we should reverse the *884 juvenile court's judgment. I therefore dissent.

The father argues on appeal that the juvenile court's judgment is inconsistent because it awards the father visitation with the child and permitted the child's living arrangement to continue until the end of the school year, i.e., two months after the date of the judgment. The father does not explain how the asserted inconsistency constitutes reversible error. I would not therefore reverse the juvenile court's judgment on that basis. See Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala. Civ. App. 1996).

On appeal, the father argues that the juvenile court erred to reversal by admitting, over his objection, certain testimony that he contends constituted inadmissible hearsay. In the following summary of the evidence presented at the trial, I have omitted the testimony about which the father complains on appeal. As is discussed later in this dissent, I believe that the evidence summarized below was sufficient to support the juvenile court's dependency determination. Thus, I conclude that, insofar as the juvenile court might have erred by admitting the testimony the father contends was hearsay, any error was harmless. See Leonard v. Leonard, 479 So.2d 1279, 1281 (Ala. Civ. App. 1985) ("[E]ven if we accept the mother's contention that such evidence is hearsay, which we do not, it nonetheless would be 'harmless error.' Rule 45, Alabama Rules of Appellate Procedure." "This is true in this instance because other evidence amply supports the trial court's action."). I would likewise reject the father's argument that the juvenile court erred by making certain "inappropriate" statements during the trial for similar reasons.

The main opinion appears to conclude that we cannot consider the applicability of § 30-3-131 to the facts of this appeal because the trial court awarded the father visitation, which, the main opinion determines, is inconsistent with the provisions of § 30-3-135, Ala. Code 1975. As mentioned above, however, "[an appellate court] will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court." Liberty Nat'l Life Ins. Co., 881 So.2d at 1020. Thus, even if the juvenile court decided that § 30-3-131 was inapplicable and awarded the father unsupervised visitation as a result of that conclusion, this court can affirm its dependency determination. Insofar as the judgment is inconsistent, however, we have been presented with no basis to reverse it for that reason. See note 7, supra.

On appeal, the father argues that the juvenile court erred to reversal by failing to "indulge a presumption that parental custody will be in the best interests of the child," citing as support Borsdorf v. Mills, 49 Ala. App. 658, 275 So.2d 338 (1973), and Hamilton v. State, 410 So.2d 64, 66 (Ala. Civ. App. 1982). For the reasons discussed above, I conclude that sufficient evidence was presented to support a determination that awarding the father custody of the child was not in her best interest based on the standard set out in § 30-3-131. I therefore reject the father's argument that a presumption in his favor should have prevailed.